IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION


CHRISTY HOLDER                                                                                          PLAINTIFF

        v.                             Civil No. 10-5070

MICHAEL J. ASTRUE, Commissioner of
Social Security Administration                                                                       DEFENDANT

## MEMORANDUM OPINION

**I.**  **Procedural Background**

Plaintiff, Christy Holder, appeals from the decision of the Commissioner of the Social Security Administration denying her applications for disability insurance benefits ("DIB"), supplemental security income benefits ("SSI"), and disabled adult child's insurance benefits ("DAC"),[1] pursuant to §42 U.S.C. 405(g).

Plaintiff protectively filed her DIB, SSI, and DAC applications on April 25, 2007, alleging a disability onset date of February 12, 1993, due to mental retardation, mood disorder, illiteracy, and depression. Tr. 76-82, 86, 141-150, 194, 199, 517. At the time of her application, Plaintiff was twenty two years old with an eleventh grade special education. Tr. 54, 204, 219. She has past relevant work as a poultry hanger and cook helper. Tr. 93, 181-192, 200.

Plaintiff's applications were denied at the initial and reconsideration levels. Tr. 95-104, 107-110. At Plaintiff's request, an administrative hearing was held on July 22, 2009. Tr. 47-75. Plaintiff

---

[1] To obtain disabled adult child benefits based on the earnings of a parent, a claimant must demonstrate, among other things, that she was under 18 years of age, or that she was 18 years or older and suffered from a disability that began before she attained the age of 22. *See* 42 U.S.C. § 402(d); 20 C.F.R. §§ 404.350, 404.1505. Disability is determined using the adult disability standard. 20 C.F.R. § 404.1505.

was present at this hearing and represented by counsel. Tr. 47-75. The ALJ rendered an unfavorable decision on August 21, 2009, finding that Plaintiff was not disabled within the meaning of the Social Security Act. Tr. 83-94. Subsequently, the Appeals Council denied Plaintiff's Request for Review on March 11, 2010, thus making the ALJ's decision the final decision of the Commissioner. Tr. 1-4. Plaintiff now seeks judicial review of that decision.

**II.     Factual Background**

   A. School Records

Plaintiff was enrolled in special education throughout her school career. Tr. 242-514. She spent two years in kindergarten and had difficulty retaining letter names, consonant sounds, numerals, and number sets. Tr. 508, 626. Plaintiff's instructor noted that she was unable to retain concepts and recall previously learned information. Tr. 242, 625-627.

In 1992, Plaintiff underwent an educational evaluation with her school's licensed psychological examiner, Ann Trevino. Tr. 490, 625-634. Plaintiff was fairly cooperative, although she gave up easily. Tr. 626. On the Vineland Adaptive Behavior Scales, Plaintiff received scores within the low adaptive level. Tr. 243, 626. On the Wechsler Intelligence Scale for Children, Third Edition ("WISC III"), Plaintiff received a full-scale IQ score between 70-79, which was within the borderline range of functioning. Tr. 490. She scored within the borderline range in verbal reasoning skills and within the mentally deficient range in visual-motor reasoning skills. Tr. 627. On the Slosson Intelligence Test-Revised, Plaintiff's scores suggested low average ability. Tr. 625. Results of the Diagnostic Achievement Battery revealed possible weaknesses in reading. Tr. 625. On the Burks' Behavior Rating Scales, Plaintiff scored within the average range on 14 of 19 scales. Tr. 626. However, she scored within the significant range on scales measuring poor intellectuality, poor

academics, poor impulse control, excessive resistance, and poor social conformity. Tr. 626. Overall testing revealed intellectual and academic functioning scores between one and two standard deviations below the mean for her age and adaptive behavioral functioning scores two standard deviations below the mean for her age. Tr. 627. Plaintiff had particular difficulties in the areas of basic reading skills, reading comprehension, written expression, math calculation, math reasoning, adaptive behavior, and listening comprehension. Tr. 490, 627.

Additionally, Plaintiff underwent a language/communicative abilities assessment. Tr. 630-634. Speech testing revealed a mild articulation disorder, receptive vocabulary skills one and a half standard deviations below the mean, and spoken language and auditory perceptual/processing abilities more than two standard deviations below the mean. Tr. 632. Ruth Linam, a licensed speech pathologist, noted that Plaintiff lacked several of the basic time, space, quality, and quantity concepts considered necessary for achievement in the first years of school. Tr. 632. According to the Arkansas Guidelines and Severity Ratings for Speech/Language Impairment, Plaintiff received a rating of mild for articulation, severe for language, and normal for voice and fluency. Tr. 632. As a result of her intellectual and speech assessment testing, Plaintiff was deemed educably mentally retarded[2] and placed in resource services for 540 minutes per week and speech therapy for 60 minutes per week. Tr. 491-502, 628. In November 1992, her resource room time was increased to

---

[2] "Educable" mental retardation is roughly equivalent to what is now referred to as mild mental retardation. This group constitutes the largest segment, roughly 85%, of those considered mentally retarded. Individuals with mild mental retardation typically develop social and communication skills during preschool years, have minimal impairment in sensorimotor areas, and often are not distinguishable from children without mental retardation until a later age. By their late teens, these individuals can acquire academic skills up to the sixth-grade level. During adult years, they "usually achieve social and vocational skills adequate for minimum self-support, but may need supervision, guidance, and assistance, especially when under unusual social or economic stress." With support, individuals with mild mental retardation "can usually live successfully in the community, either independently or in supervised settings." AM. PSYCHIATRIC ASS'N. DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, 43 (4th ed., 2000) ("DSM-IV").

810 minutes per week. Tr. 505-506.

In February 1993, Plaintiff's first grade special education teacher, Miss Stamps, noted that Plaintiff was not making progress with her current individual education plan ("IEP") placement. Tr. 480. In May 1993, Plaintiff was placed in self-contained special education classes for 1590 minutes per week with an additional 60 minutes per week of speech therapy. Tr. 449-475. She was assessed with a mild articulation disorder when compared to her chronological age, and a moderate to severe language delay which was commensurate with her overall ability. Tr. 454. She was placed in the extended year service program to receive additional instruction over the summer. Tr. 486-487.

In April 1994, Plaintiff was functioning between one and two standard deviations below the mean for her age group. Tr. 423. Her adaptive skills were also two standard deviations below the mean for her age. Tr. 423. At the time, Plaintiff was working at the beginning first grade level in reading, math, and spelling. Tr. 423. She was making passing grades in all academic areas, with math calculation being a particular strength. Tr. 441.

In December 1994, Plaintiff was receiving 1500 minutes of self-contained special education instruction per week. Tr. 413-414. Plaintiff was also receiving speech therapy and had made a "great deal of progress." Tr. 417. As a result, she was discharged from speech therapy services. Tr. 417-419.

On May 22, 1996, an annual progress review was conducted. Tr. 398-412. Plaintiff's teachers concluded that she was making progress in all academic areas, although she was still having difficulty in reading. Tr. 398. According to the Brigance Test of Basic Skills, Plaintiff functioned at a 4.5 grade level in math, a 1.6 grade level in reading, and a 2.0-3.0 grade level in language and written expression. Tr. 398, 401. It was recommended that Plaintiff receive 1610 minutes per week

of self-contained classroom instruction to address deficits in listening comprehension, basic reading skills, reading comprehension, math calculation, math reasoning, written expression, and adaptive behavior. Tr. 398. According to recent testing, Plaintiff was within the mentally retarded range of intelligence. Tr. 401.

In May 1997, Plaintiff's teacher noted that she continued to make progress in all academic areas, "with progress in reading and spelling being slower and more difficult than that in math." Tr. 367. Plaintiff was functioning on a second grade level in reading and a fourth to fifth grade level in mathematics. Tr. 367, 369. She had achieved 3/3 goals in basic reading, adaptive behavior, and listening comprehension, 2/3 goals in reading comprehension and math calculation, 3/4 goals in math reasoning, and 4/4 goals in written expression. Tr. 367. Plaintiff's self-contained classroom minutes were increased from 1310 to 1485 minutes per week. Tr. 368. Tr. 363-380.

In December 1997, while Plaintiff was enrolled in sixth grade, it was recommended that she receive 1700 minutes of special services per week to address reading, math, language arts, and adaptive behavior. Tr. 341-362. Plaintiff previously received 1450 minutes of special services per week, which the Special Services Committee did not deem adequate to meet her needs. Tr. 341-347. An instructor noted that Plaintiff exhibited strength in the area of oral communication skills and a relative strength in mathematics. Tr. 349. However, she noted that Plaintiff read on a primer to first grade level and had difficulty in capitalization, punctuation, and spelling. Tr. 349-352.

In May 1998, Plaintiff was enrolled in special education services in reading, language, math, and science. Tr. 277. Her teachers noted she was "a hard worker and she interacts well with both teachers and peers. She has good social skills, a sense of responsibility, and is very helpful in the classroom." Tr. 278. Her teacher noted that Plaintiff learned best using visual and auditory modes.

Tr. 278. At this time, Plaintiff was on a first grade reading level. Tr. 278. After undergoing extensive testing, Plaintiff was assessed with mental retardation. Tr. 294.

In December 1998, an annual review of Plaintiff's seventh grade progress was conducted. Tr. 253. Plaintiff's special education teacher noted that she was a "kind, hardworking student" who tried her best to please her teachers and had several friends. Tr. 253. She noted that Plaintiff struggled with "feeling stupid" due to her difficulty reading, which severely affected her ability to function in class. Tr. 253. At this time, Plaintiff received 945 minutes per week of specialized instruction in the areas of reading comprehension, basic reading, math calculation, math reasoning, and written expression. Tr. 253.

    B. <u>Medical Records</u>

On July 24, 2007, Plaintiff underwent a consultative mental evaluation and intellectual assessment with Scott McCarty, M.D. Tr. 595-598. Plaintiff reported a history of learning difficulties including poor reading and arithmetic skills and difficulty comprehending books. Tr. 595. She stated she was a "hands-on learner," but had difficulty staying on pace. Tr. 595. She reportedly could add and subtract, but could not multiply or divide. Tr. 595. She dropped out in twelfth grade and repeated either the fourth of fifth grade. Tr. 595. Plaintiff completed a training workshop at the Richardson Center and had last worked two years earlier as a poultry hanger at George's. Tr. 596. She was reportedly terminated for not keeping count of the number of chickens she had processed and for not keeping pace. Tr. 596. She was also terminated from McDonald's and Goodwill for being unable to operate the cash register. Tr. 596.

Emotionally, Plaintiff reported irritability, crying spells, and feeling sad "maybe two to three days a week." Tr. 595. She denied emotional problems other than depressive symptoms related to

her self-directed frustration and aggravation about her inability to learn. Tr. 595. She was currently taking Prozac for depression. Tr. 595. Plaintiff was pregnant at the time of the interview. Tr. 595. She also had one young infant. Tr. 596.

Upon examination, Plaintiff was calm, cooperative, and friendly. Tr. 596. She reported her predominant mood as "happy" and was relaxed and jovial at times, but also tearful when discussing her learning frustrations. Tr. 596. Thought processes were somewhat slow, although speech was logical, relevant, organized, and goal-directed. Tr. 596. Plaintiff did not show any symptoms of a formal thought disorder or evidence of formal delusional material. Tr. 596. She denied hallucinations and suicidal and homicidal ideation. Tr. 596. Dr. McCarty noted that Plaintiff exhibited good cooperation and persistence, and an adequate ability to follow directions. Tr. 597.

On the Wechsler Adult Intelligence Scale-III, Plaintiff received a verbal IQ score of 74, a performance IQ score of 74, and a full-scale IQ score of 72, which placed her within the borderline range of intelligence. Tr. 597. Dr. McCarty assessed Plaintiff with adjustment disorder with depressed mood, learning disorder not otherwise specified, rule out reading disorder, and borderline intellectual functioning. Tr. 597. He estimated Plaintiff's Global Assessment of Functioning ("GAF") score at 45-55. Tr. 597.

Plaintiff denied difficulty with activities of daily living. Tr. 597. However, Dr. McCarty found that her reading and arithmetic difficulties resulted in moderate to severe limitations in the areas of cooking, shopping, and money management. Tr. 597. He also found that although Plaintiff could socially interact in an adequate manner, her depressive irritability might result in mild to moderate limitations in socializing at times. Tr. 598. Dr. McCarty noted that Plaintiff tracked adequately, but may have moderate limitations in coping with the typical mental demands of basic

work-like tasks and would have severe limitations if reading and performing math were required. Tr. 598. Dr. McCarty found mild to moderate limitations in the ability to attend and sustain concentration on basic tasks, but noted excellent persistence. Tr. 598. He also found moderate limitations in Plaintiff's ability to complete work tasks within an acceptable time frame. Tr. 598.

In a Psychiatric Review Technique dated August 7, 2007, Brad F. Williams, Ph.D., an agency specialist, found that Plaintiff did not meet Listings 12.04 (affective disorders) or 12.05 (mental retardation). Tr. 601-614. He found mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation, each of extended duration. Tr. 611. In a Mental Residual Functional Capacity ("RFC") Assessment, Dr. Williams found that Plaintiff was moderately limited in her ability to understand, remember, and carry-out detailed instructions, maintain attention and concentration for extended periods, make simple work-related decisions, complete a normal workday and workweek without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, accept instructions and respond appropriately to criticism from supervisors, and set realistic goals or make plans independently of others. Tr. 615-618. He found no significant limitations in all other work-related areas. Tr. 615-616. Based on his findings, Dr. Williams determined Plaintiff could perform work where interpersonal contact is incidental to the work performed, complexity of tasks is learned and performed by rote, with few variables and little judgment, and the supervision required is simple, direct, and concrete. Tr. 617.

### III.  Applicable Law

The Court's role on review is to determine whether the Commissioner's findings are supported by substantial evidence in the record as a whole. *Ramirez v. Barnhart*, 292 F.3d 576, 583 (8th Cir. 2003). "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might accept it as adequate to support a conclusion." *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002) (quoting *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001)). In determining whether evidence is substantial, the Court considers both evidence that detracts from the Commissioner's decision as well as evidence that supports it. *Craig v. Apfel*, 212 F.3d 433, 435-36 (8th Cir. 2000) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000)). If, after conducting this review, "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the [Secretary's] findings," then the decision must be affirmed. *Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007) (quoting *Siemers v. Shalala*, 47 F.3d 299, 301 (8th Cir. 1995)).

To be eligible for disability insurance benefits, a claimant has the burden of establishing that she is unable to engage in any substantial gainful activity due to a medically determinable physical or mental impairment that has lasted, or can be expected to last, for no less than twelve months. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); 42 U.S.C. § 423(d)(1)(A). The Commissioner applies a five-step sequential evaluation process to all disability claims: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment that significantly limits her physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a disabling impairment listed in the regulations; (4) whether the claimant has the RFC to perform her past relevant work; and (5) if the claimant cannot perform her past work, the burden of production then shifts to the Commissioner

to prove that there are other jobs in the national economy that the claimant can perform given her age, education, and work experience. *Pearsall*, 274 F.3d at 1217; 20 C.F.R. § 404.1520(a), 416.920(a). If a claimant fails to meet the criteria at any step in the evaluation, the process ends and the claimant is deemed not disabled. *Eichelberger v. Barnhart*, 390 F.3d 584, 590-91 (8th Cir. 2004).

**IV.    Discussion**

At step one, the ALJ determined Plaintiff had engaged in substantial gainful activity since February 12, 1993, the alleged onset date. Tr. 88-89. However, since Plaintiff was not engaged in substantial gainful activity at the time of the hearing, the ALJ continued his analysis beyond step one. Tr. 88-89. At step two, the ALJ found that Plaintiff suffered from borderline intellectual functioning and depression, both of which were considered severe impairments under the Act. Tr. 89. At step three, he determined Plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment. Tr. 89-90. At step four, the ALJ found that Plaintiff had the RFC to perform a full range of work at all exertional levels, but could understand, remember, and carry out simple, routine, and repetitive tasks, respond appropriately to supervisors, co-workers, and usual work situations, have occasional contact with the general public, and perform low-stress work, meaning work involving occasional decision-making and occasional changes in work place settings. Tr. 91-93. With the aid of a vocational expert, the ALJ determined Plaintiff could perform her past relevant work as a poultry hanger or cook helper. Tr. 93. Thus, at step four, the ALJ determined Plaintiff was not under a disability at any time between February 12, 1993, and August 21, 2009. Tr. 93-94.

Plaintiff contends that the ALJ erred by failing to consider all the relevant evidence when determining her RFC.  *See* Pl.'s Br. 4-7.  This Court agrees.  At the fourth step of the evaluation, a disability claimant has the burden of establishing his RFC.  *Eichelberger*, 390 F.3d at 591; *Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir. 2004).  A claimant's RFC is the most he can do despite his limitations.  20 C.F.R. § 404.1545(a)(1).  The ALJ determines a claimant's RFC based on "all relevant evidence, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations."  *Masterson*, 363 F.3d at 737.  The Eighth Circuit has stated that "a claimant's residual functional capacity is a medical question."  *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001).  Thus, although the ALJ bears the primary responsibility for determining a claimant's RFC, there must be "some medical evidence" to support the ALJ's determination.  *Eichelberger*, 390 F.3d at 591; *Dykes v. Apfel*, 223 F.3d 865, 867 (8th Cir 2000).

The ALJ found that Plaintiff suffers from borderline intellectual functioning.  Tr. 91-92. Specifically, he found that Dr. McCarty's diagnosis of borderline intellectual functioning "is consistent with the findings of school psychologist Ann Trevino who stated in 1992, when the claimant was seven years-old, that the claimant was functioning in the borderline range of intelligence."  Tr. 91-92.  This is a mischaracterization of the records.  First, Dr. McCarty's findings were based solely upon standard IQ testing and his observations of Plaintiff during the evaluation. *Jenkins v. Apfel*, 196 F.3d 922, 925 (8th Cir. 1999) (the assessment of a doctor who evaluates a claimant once or not at all does not usually constitute substantial evidence).  Moreover, he did not have the benefit of Plaintiff's school records or prior intellectual evaluations to aid in forming his opinion.

The vast majority of Plaintiff's school records reveal that although her IQ scores reflected borderline intellectual functioning, her adaptive and academic deficits placed her within the mentally retarded range.[3] In 1992, Ms. Trevino noted Plaintiff's IQ scores were within the borderline range of functioning, but her intellectual and adaptive behavior skills measured at or near two standard deviations below the mean for her age. Tr. 628. Ms. Trevino determined that these areas of functioning "suggest a possible primary handicapping condition of mentally retarded." Tr. 628.

Additionally, contrary to Defendant's arguments, Plaintiff's adaptive functioning and reading skills did not improve as she progressed in school. In April 1994, Plaintiff's adaptive skills remained two standard deviations below the mean for her age. Tr. 423. In May 1996, Plaintiff was functioning "in the mentally retarded range of intelligence according to the most recent complete evaluation." Tr. 401. On the Brigance Test of Basic Skills, Plaintiff was reading on a 1.6 grade level. Tr. 401. In December 1997, when Plaintiff was in sixth grade, she was reading on a primer to first grade level. Tr. 349. In May 1998, after undergoing extensive testing, Plaintiff was assessed with mental retardation. Tr. 294. These records reflect a history of severe intellectual and adaptive difficulties.

In this instance, it appears that the ALJ only took into account Plaintiff's IQ scores without acknowledging limitations resulting from her severe reading and adaptive functioning deficits. For these reasons, the Court believes remand is necessary for the ALJ to fully consider the evidence of record and determine how Plaintiff's cognitive impairments affect her ability to work. Upon remand, the ALJ should send Plaintiff for a consultative examination that takes into account her *overall* level

---

[3] General intellectual functioning is defined by the intelligence quotient (IQ or IQ-equivalent) obtained by assessment with one or more of the standardized, individually administered intelligence tests. Significantly subaverage intellectual functioning is defined as an IQ of about 70 or below. However, there is a measurement error of approximately 5 points in assessing IQ, although this may vary from instrument to instrument. Thus, "it is possible to diagnose Mental Retardation in individuals with IQs between 70 and 75 who exhibit significant deficits in adaptive behavior." DSM IV, *supra* note 2, at 41-42.

of functioning, including her adaptive functioning and possible learning disorders. The consultative examiner should be provided with Plaintiff's school records prior to the examination. Once a proper evaluation is completed, the ALJ should review the evidence and assess Plaintiff's RFC based on all relevant evidence, including medical records, opinions of treating medical personnel, and Plaintiff's description of her own limitations. *Dunahoo v. Apfel*, 241 F.3d 1033, 1039 (8th Cir. 2001). If the ALJ chooses to discredit Plaintiff's subjective statements, he should state specific reasons for doing so.

## V.   Conclusion

Accordingly, the ALJ's decision denying benefits to Plaintiff is not supported by substantial evidence and should be reversed and remanded to the Commissioner for further consideration pursuant to sentence four of 42 U.S.C. § 405(g).

ENTERED this 16th day of June 2011.

*/s/ J. Marschewski*
HON. JAMES R. MARSCHEWSKI
CHIEF U.S. MAGISTRATE JUDGE